UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| ANTHONY LEON COLLIER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:14-cv-00365-JMS-MJD |
| | ) | |
| JOHN F. CARAWAY, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

Plaintiff Anthony Collier brought this lawsuit pursuant to *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971), alleging that Defendants, various medical and non-medical employees at Federal Correctional Institution Terre Haute ("FCI Terre Haute"), were deliberately indifferent to his eye conditions during his incarceration.[1] [Filing No. 90.] Defendants now move for summary judgment in their favor, arguing that the undisputed evidence entitles them to judgment as a matter of law. [Filing No. 164.] Because no reasonable factfinder could find that Defendants were deliberately indifferent to Mr. Collier's conditions, the Court **GRANTS** Defendants' Motion for Summary Judgment.

## I.
### LEGAL STANDARD

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). As the current version of Rule 56 makes clear, whether a party asserts that a fact is undisputed or genuinely disputed, the party must support

---

[1] As explained in greater detail below in Part II.D, Defendants include Warden John Caraway, Warden Leann LaRiva, Ms. Christina Desmith, Dr. Thomas Bailey, Physician Assistant Genevieve Daugherty, and Ms. Hollie Bowman.

the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated. Fed. R. Civ. P. 56(c)(4). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009). In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative. *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005). Fact disputes that are irrelevant to the legal question will not suffice to defeat summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003). The moving party is entitled to summary judgment if no reasonable factfinder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008). It cannot weigh evidence or make credibility determinations on

summary judgment because those tasks are left to the fact-finder. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has "repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them," *Johnson*, 325 F.3d at 898. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Ponsetti v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010).

## II.
### BACKGROUND

The following factual background is set forth pursuant to the standards detailed above. The facts stated are not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light most favorable to "the party against whom the motion under consideration is made." *Premcor USA, Inc. v. American Home Assurance Co.*, 400 F.3d 523, 526-27 (7th Cir. 2005).

### A. Pre-Incarceration Medical History

Mr. Collier's history of eye troubles began long before his periods of incarceration at FCI Terre Haute,[2] which ran from August 8 to October 24, 2007, and from January 17, 2008, to December 2, 2014. [Filing No. 164-2 at 1.] Sometime in 1999, Mr. Collier suffered a retinal detachment in his right eye. [Filing No. 164-28 at 15-16.] During the procedure to reattach the retina, the surgeon removed the lens from Mr. Collier's right eye. [Filing No. 164-28 at 17.] The retinal detachment reduced Mr. Collier's vision in his right eye from 20/40 to 20/200. [Filing

---

[2] FCI Terre Haute is a medium security facility operated by the Bureau of Prisons ("BOP") and is one of three facilities that make up Federal Correctional Complex Terre Haute ("FCC Terre Haute"). [Filing No. 164-1 at 1.] FCC Terre Haute also includes a minimum security work camp and high security United States penitentiary. [Filing No. 164-1 at 1.]

No. 164-28 at 17.]  Mr. Collier has reported that his lost eyesight was due to boxing.  [Filing No. 164-3 at 1.]

**B.  Treatment During Incarceration**

During his period of incarceration, Mr. Collier saw several in-house and outside medical professionals regarding his eye problems.  On October 23, 2008, Mr. Collier visited in-house PA Alex Jastillano and relayed his concerns regarding his right eye.  [Filing No. 164-3 at 1.]  PA Jastillano additionally diagnosed Mr. Collier with refractive error in his left eye (blurry vision) and requested an optometry appointment for Mr. Collier.  [Filing No. 164-3 at 2.]  On November 14, 2008, Dr. Thomas Webster approved PA Jastillano's request for an optometry appointment.  [Filing No. 164-4 at 1.]  On December 15, 2008, in-house optometrist Dr. Cristian Radaneata performed a refraction examination and ordered eyeglasses for Mr. Collier.  [Filing No. 164-4 at 2-3.]

On July 2, 2010, Mr. Collier saw in-house PA Amy McDonald, complaining of worsening eye and vision problems.  [Filing No. 164-5 at 1.]  PA McDonald noted that Mr. Collier last had an optometry exam almost two years prior, and scheduled a "vision consult" for him.  [Filing No. 164-5 at 2.]

On October 5, 2010, Mr. Collier saw Dr. Radaneata for another in-house refraction examination and was ordered glasses.  [Filing No. 164-6 at 1.]  Dr. Radaneata placed a request for Mr. Collier to see an outside ophthalmologist for "evaluation for aphatik [sic] rigid contact lens."[3]  [Filing No. 164-6 at 1.]  That request was approved on October 8, 2010.  [Filing No. 164-7 at 1.]

---

[3] According to Mr. Collier, keratoconus (bulging cornea causing blurred vision), the condition with which he was diagnosed, is not correctable by glasses.  [Filing No. 164-28 at 49-50.]

On December 14, 2010, Mr. Collier saw outside ophthalmologist Dr. Padma Ponugoti, requesting a contact lens fitting for rigid gas permeable lenses. [Filing No. 164-8.] Dr. Ponugoti assessed Mr. Collier with 20/400 in the right eye and 20/80 in the left eye. [Filing No. 164-8 at 3.] Dr. Ponugoti noted the history of trauma to and surgery on Mr. Collier's right eye. [Filing No. 164-8 at 3.] Dr. Ponugoti observed arcus (grey ring of cholesterol) in each eye and "moderate cortical changes" in the left eye. [Filing No. 164-8 at 3.] Dr. Ponugoti opined that Mr. Collier's left eye was "within normal limits" and that his right eye had "limited visual potential." [Filing No. 164-8 at 3.] Dr. Ponugoti recommended that Mr. Collier follow up with an optometrist for a rigid gas permeable contact lens fitting and an eye exam. [Filing No. 164-8 at 3.]

On April 6, 2011, Dr. Radaneata performed a funduscopic exam and noted that Mr. Collier would need follow-up appointments for a refraction test and contact lens fitting. [Filing No. 164-9 at 3.] On May 3, 2011, Dr. Radaneata saw Mr. Collier for a refraction exam. [Filing No. 164-9 at 1.] Dr. Radaneata ordered glasses for Mr. Collier and noted that Mr. Collier would follow up the next month for "RGP" (rigid gas permeable) lens fitting. [Filing No. 164-9 at 1.] On June 23, 2011, Dr. Radaneata fitted Mr. Collier for rigid gas permeable contact lenses. [Filing No. 164-10 at 1.]

On April 24, 2012, Mr. Collier sent a form request to "A. Rupska, RN/AHSA," complaining that

> [a] few weeks ago while cleaning my contact lens it fractured. I've spoken to medical staff . . . . I have not heard whether the contact was ordered or not. I'm blind in my right eye and my vision is very weak in my left eye. Without the contact lens I can-not [sic] read or see anything on the computer.

[Filing No. 164-11 at 1.] On May 1, 2012, RN Rupska responded: "Your contact lens are [sic] on order but you should be able to wear your glasses in the meantime." [Filing No. 164-11 at 1.] The in-house eye doctor was unable to order a replacement gas permeable contact lens for Mr. Collier's

right eye, so, on August 8, 2012, the BOP Health Services placed a request for an ophthalmology appointment and new contact lens order.  [Filing No. 164-12 at 1.]  On August 15, 2012, the BOP approved the request to refer Mr. Collier to an ophthalmologist.  [Filing No. 164-13 at 1.]

On February 22, 2013, Mr. Collier saw in-house optometrist Dr. Donald Auxier and complained of vision problems and a broken contact lens.  [Filing No. 164-14 at 1.]  Dr. Auxier assessed Mr. Collier with blindness in one eye, directed monthly follow-ups for two months, and directed Mr. Collier to "see DR. Raednata [sic] for contact consult."  [Filing No. 14 at 1.]  On March 5, 2013, Dr. Radaneata saw Mr. Collier and made a note to "order contact lens."  [Filing No. 164-15 at 1.]

On March 28, 2013, FNP Christopher Blila performed a consultation encounter and noted as follows: "Schedule for outside optometry visit (Vision Mart) to fit for contact lens per Opthalmology [sic] request.  Optometry office has been calling and asking for an appointment to be scheduled."  [Filing No. 164-16 at 1.]

On June 19, 2013, Mr. Collier was seen by an outside eye doctor at Vision Mart.  [Filing No. 164-17 at 1.]  As noted by EMT Douglas Hanna after the appointment, Mr. Collier "return[ed] with prescription for contact lens solution and contact lens case for care and maintainence [sic] of contact lens.  [Mr. Collier] stated that he is supposed to go back to be fitted for new contact lens.  No orders sent confirming this."  [Filing No. 164-17 at 1.]  On June 20, 2013, the day following Mr. Collier's outside consultation, FNP Blila made the following note:

> Apparently [Mr. Collier] is to return at some point to be fitted for contact lens.  However, we currently do not have any paperwork . . . and do not know what kind of contact lens will be ordered.  Have discussed this with pharmacy.  Once we receive this information about what contact lens [Mr. Collier] will be receiving we will place the appropriate NFR [non-formulary request] for the solution that goes with the contact lens.

[Filing No. 164-18 at 1.]

On January 3, 2014, Mr. Collier saw RN Karl Norris, complaining of left eye pain at a level 5 intensity out of 10. [Filing No. 164-19 at 1.] RN Norris observed that Mr. Collier's left eye was "extremely red." [Filing No. 164-19 at 1.] A doctor was notified of RN Norris's findings and advised that Mr. Collier should be sent to the emergency department. [Filing No. 164-19.] Mr. Collier was treated at the Union Hospital emergency department by optometrist Dr. Matthew Keeler, who diagnosed Mr. Collier with a corneal abrasion ("scratch on the eye"). [Filing No. 164-20 at 1-2.] Mr. Collier was discharged with an antibiotic ointment to guard against infection. [Filing No. 164-20 at 2-4.] Upon returning to FCI Terre Haute, Mr. Collier told the officers who transported him that he was "still in pain," but that he had to give his medication "time to work." [Filing No. 164-28 at 41-42.] RN Norris made a notation indicating that he had a consultation with Mr. Collier (which Mr. Collier denies occurred) and indicated that Mr. Collier was "good now." [Filing No. 164-21 at 1.]

Sometime in February or March 2014, Mr. Collier saw BOP physician Dr. Thomas Bailey for a chronic care follow-up unrelated to his eye difficulties. [Filing No. 164-28 at 29-30.] Among other complaints, Mr. Collier complained of some irritation in his left eye from the corneal abrasion and of pain and floaters in his right eye. [Filing No. 164-28 at 30.] Mr. Collier told Dr. Bailey that he was supposed to be seen by the optometrist for his right eye pain. [Filing No. 164-28 at 30.] Dr. Bailey did not examine Mr. Collier's eyes during Mr. Collier's visit, [Filing No. 164-28 at 71], but prescribed ophthalmic ointment for Mr. Collier's left eye, [Filing No. 164-28 at 30]. Dr. Bailey is neither an optometrist nor an ophthalmologist. [Filing No. 164-28 at 71.] Dr. Bailey informed Mr. Collier that he would be scheduled to see an eye specialist. [Filing No. 164-28 at 72-73.] According to Mr. Collier, shortly after the appointment he was scheduled to be seen

by the in-house optometrist, but that appointment was later cancelled. [Filing No. 164-28 at 71-72.] Mr. Collier does not recall seeing Dr. Bailey at any other time. [Filing No. 264-28 at 36-37.]

On March 3, 2014, Mr. Collier saw RN Matthew Worthington in BOP Health Services for a follow up on a left eye ulcer diagnosed in January. [Filing No. 164-22 at 1.] Mr. Collier stated that he had a contact lens stuck on his eye which formed an ulcer. [Filing No. 164-22 at 1.] Mr. Collier complained of "[n]agging pain." [Filing No. 164-22 at 1.] RN Worthington scheduled a follow-up sick call appointment and stated that Mr. Collier would be "[p]laced on [c]allout." [Filing No. 164-22 at 1.]

On April 1, 2014, Mr. Collier saw in-house PA Genevieve Daugherty for a follow up from his January 2014 emergency room visit. [Filing No. 164-23 at 1.] Mr. Collier complained of vision problems, explaining that he was blind in his right eye and that his left eye was weak. [Filing No. 164-23 at 1.] Mr. Collier said that he was told that the only way to improve his left eye was to have his special contact lens properly fitted. [Filing No. 164-23 at 1.] Mr. Collier reported that one of his contacts tore and that he did not wear the other one because it slips around his eye. [Filing No. 164-23 at 1.] Mr. Collier reported that he was to follow up with ophthalmology for a fitting, but that the fitting never happened. [Filing No. 164-23 at 1.] PA Daugherty took the ill-fitting lenses from Mr. Collier and instructed him to instead wear glasses until he could be seen by the ophthalmologist. [Filing No. 164-28 at 80-81; Filing No. 164-23 at 2.] PA Daugherty requested an ophthalmology appointment for Mr. Collier. [Filing No. 164-23 at 2.] PA Daugherty's request for an outside ophthalmologist appointment was approved on April 2, 2014. [Filing No. 164-24 at 1.]

Mr. Collier was scheduled to see outside ophthalmologist Dr. Chirag Patel on June 23, 2014, but Dr. Patel was unavailable. [Filing No. 164-1 at 6; Filing No. 164-25 at 1.] Mr. Collier's

appointment was rescheduled for July 2, 2014, but for some unknown reason he was marked "no show" on that date, and the appointment was again rescheduled. [Filing No. 164-1 at 6; Filing No. 164-25 at 1.] Finally, Mr. Collier saw Dr. Patel on August 29, 2014. [Filing No. 164-26 at 2-4.] Mr. Collier reported his vision difficulties and sought contact lenses, which he said corrected his left eye vision to 20/40. [Filing No. 164-26 at 2.] Dr. Patel diagnosed Mr. Collier with keratoconus (bulging cornea causing blurred vision), worse in the right eye than the left. [Filing No. 164-26 at 4.] Dr. Patel noted no pain in the right eye, but, "given slight [light perception in right eye] would recommend trying to get the [intraocular pressure] down." [Filing No. 164-26 at 4.] Dr. Patel did not prescribe any medication or particular treatment for the intraocular pressure. [*See* Filing No. 164-26 at 4.] Dr. Patel concluded that Mr. Collier needed an evaluation with a cornea specialist to address his keratoconus and that he would likely need rigid gas permeable lenses. [Filing No. 164-26 at 4.] Dr. Patel instructed Mr. Collier to "use glasses for protection" until he could get fitted for lenses. [Filing No. 164-26 at 4.]

As a follow up to Dr. Patel's report, Dr. William Wilson placed a request for another outside evaluation on September 3, 2014, stating, "[A]waiting consult note from ophthmologist [sic][.]" [Filing No. 174-4 at 1.] Records show that the "date received" for the consultation request was November 3, 2014, and the appointment was scheduled for December 3, 2014. [Filing No. 174-5 at 1.] Mr. Collier was not again seen by an eye specialist prior to his release from FCI Terre Haute on December 2, 2014. [Filing No. 164-2 at 1.]

### C. Treatment Following Incarceration

On July 27, 2015, Mr. Collier visited his private corneal specialist, Dr. Thomas Cowden, for an evaluation of his keratoconus. [Filing No. 164-29 at 1.] Mr. Collier complained of blurry vision and having "things floating around" in his left eye. [Filing No. 164-29 at 1.] Dr. Cowden

recommended that Mr. Collier see a doctor for specialty contact lens fitting and advised him that surgery may be needed if the contacts do not help. [Filing No. 164-29 at 5.]. Dr. Cowden prescribed eyedrops to aid with pressure in Mr. Collier's right eye. [Filing No. 164-29 at 5.]

According to Mr. Collier, his private treaters later determined after trying various contact lenses that Mr. Collier was "contact lens intolerant." [Filing No. 164-28 at 112.] After Mr. Collier complained that he could not see, his doctor prescribed sclera lenses that he can only wear for a few hours at a time before causing him pain. [Filing No. 164-28 at 112.]

### D. Defendants' Roles at FCI Terre Haute

Mr. Collier's lawsuit proceeds against the following Defendants: former Terre Haute Complex Warden John F. Caraway, former FCI Terre Haute Warden LeAnn LaRiva, Health Services Assistant Christina Desmith, Health Systems Specialist Hollie Bowman, Dr. Thomas Bailey, and PA Genevieve Daugherty. [Filing No. 15; Filing No. 16; Filing No. 53; Filing No. 90-1.] Mr. Collier interacted with each of these Defendants during his incarceration at FCI Terre Haute and complains that each either failed to sufficiently treat him or failed to sufficiently seek out treatment for him.

#### 1. Complex Warden Caraway

During his tenure from September 2012 through November 2014 as Complex Warden, Mr. Caraway was responsible for supervising the administration of FCC Terre Haute. [Filing No. 164-32 at 1.] Warden Caraway did not make medical decisions nor provide medical care to inmates, instead deferring to the medical professionals responsible for treating inmates. [Filing No. 164-32 at 1-2.]

On approximately two occasions in June 2013, Mr. Collier spoke to Warden Caraway during "main line." Main line was a weekly period when prison administrators, wardens, and

health service personnel made themselves available to inmates to discuss their concerns. [Filing No. 164-28 at 26.] On June 19, 2013, Mr. Collier complained to Warden Caraway that he had a contact that had been damaged for nine months and that he needed a new contact. [Filing No.164-28 at 32.] According to Mr. Collier, Warden Caraway "storm[ed]" over to Assistant Health Services Administrator Kimberly Klink to inquire about the delay in replacing Mr. Collier's contact. [Filing No. 164-28 at 62; Filing No. 164-28 at 32-33.] Later that day, Mr. Collier was seen by an outside eye doctor regarding contacts. [Filing No. 164-17 at 1.] On another (or perhaps the same) occasion in 2013, Mr. Collier complained to Warden Caraway that he was "experiencing severe pain," floaters, and halos in his right eye. [Filing No. 164-28 at 27.] Warden Caraway took down Mr. Collier's name and number and told him that he would look into it. [Filing No. 164-28 at 28.] Mr. Collier described Warden Caraway as "hands-on. And what I mean by that, he would take your name and number. That's how you knew he was actually going to get back to you, or he was going to actually look into it." [Filing No. 164-28 at 28.]

### 2. Warden LaRiva

Warden LaRiva served at FCI Terre Haute from November 3, 2013, to October 18, 2015. [Filing No. 164-33 at 1.] Warden LaRiva supervised the administration of FCI Terre Haute. [Filing No. 164-33 at 1.] Warden LaRiva did not make medical decisions nor provide medical care to inmates, instead deferring to the medical professionals responsible for treating inmates. [Filing No. 164-33 at 1-2.]

On May 14, 2014, Mr. Collier complained to Warden LaRiva during main line about being denied medical treatment for his eye problems. [Filing No. 164-28 at 65-66; Filing No. 90-1 at 18.] Approximately two weeks later, Mr. Collier again complained, with a written note, to Warden LaRiva that he was not receiving adequate treatment. [Filing No. 164-28 at 65-66; Filing No. 90-

1 at 18.] Warden LaRiva took the note and told Mr. Collier that she would look into it. [Filing No. 164-28 at 65-66; Filing No. 90-1 at 18.] Warden LaRiva handed Mr. Collier's note to Ms. Klink and asked Ms. Klink to look into the issue. [Filing No. 164-28 at 65-66; Filing No. 90-1 at 18.] Mr. Collier states that Warden LaRiva did not personally "start looking into [his] problems and [his] allegations" until after he began filing grievances. [Filing No. 164-28 at 70.]

### 3. Ms. Desmith

Ms. Desmith has been a health services assistant at FCC Terre Haute since January 17, 2012. [Filing No. 164-34 at 1.] As health services assistant, Ms. Desmith provides administrative support to the health services administrators. [Filing No. 164-34 at 1.] Ms. Desmith's responsibilities include maintaining medical records and assisting with statistical and financial management for the health services department. [Filing No. 164-34 at 1.] Ms. Desmith has no medical training and did not provide any medical care to or make any medical decisions for Mr. Collier. [Filing No. 164-34 at 1-2.]

Mr. Collier told Ms. Desmith that he had severe pain in his right eye sometime in 2014. [Filing No. 164-28 at 30.] On another occasion in 2014, Mr. Collier spoke to Ms. Desmith while he was at health services and asked her when he would be scheduled to see a corneal specialist. [Filing No. 164-28 at 76-77.] Ms. Desmith told Mr. Collier that he would see a specialist soon. [Filing No. 164-28 at 77.] Mr. Collier informed Ms. Desmith that he was scheduled to be released soon, on December 2. [Filing No. 164-28 at 77.] Ms. Desmith responded that Mr. Collier's appointment was scheduled for after his release. [Filing No. 164-28 at 77.] Ms. Desmith apologized and explained to Mr. Collier that she had nothing to do with appointment scheduling. [Filing No. 164-28 at 77.]

### 4. Ms. Bowman

Ms. Bowman has been a health systems specialist at FCC Terre Haute since December 4, 2011. [Filing No. 164-35 at 1.] Ms. Bowman is responsible for developing quality improvement programs for the health care units, including risk assessment, infection prevention, and peer review. [Filing No. 164-35 at 1.] Ms. Bowman's duties are administrative, and she does not treat inmates or make treatment decisions. [Filing No. 164-35 at 2.]

Mr. Collier frequently complained about his eye problems to Ms. Bowman during main line and when he otherwise saw her. [Filing No. 164-28 at 26-27.] Ms. Bowman informed Mr. Collier about several of his eye appointments and appointment cancellations. [Filing No. 164-28 at 48-49; Filing No. 164-28 at 92-96.] At his deposition, Mr. Collier stated that he believed that Ms. Bowman was responsible for optometry scheduling and worked for the BOP's optometrist because she worked near the optometrist's office. [Filing No. 164-28 at 93-94.]

### 5. Dr. Bailey

As described above in Section B, Dr. Bailey is a physician at FCC Terre Haute. [Filing No. 164-28 at 29-30.] Dr. Bailey is neither an optometrist nor an ophthalmologist. [Filing No. 164-28 at 71.] Mr. Collier saw Dr. Bailey for a chronic care follow-up unrelated to his eye difficulties. [Filing No. 164-28 at 29-30.] Mr. Collier complained about his eyes, and Dr. Bailey prescribed ophthalmic ointment. [Filing No. 164-28 at 30.]

### 6. PA Daugherty

As described above in Section B, PA Daugherty works in-house at FCC Terre Haute. Mr. Collier saw PA Daugherty just one time, for a follow up from his January 2014 emergency room visit. [Filing No. 164-23 at 1.] Mr. Collier complained that his contact lenses were ill-fitting and damaged and that he needed to follow up with an ophthalmologist for a contact lens fitting. [Filing

No. 164-23 at 1.] PA Daugherty took his ill-fitting and damaged contact lenses from him and instructed him to instead wear glasses until he could be seen by the ophthalmologist. [Filing No. 164-28 at 80-81; Filing No. 164-23 at 2.] After the appointment, PA Daugherty placed a request for an outside ophthalmologist appointment, which was approved the next day. [Filing No. 164-24 at 1.] Mr. Collier complains that he told PA Daugherty about the pain in his right eye and told her that he wanted to see an optometrist for treatment. [Filing No. 164-28 at 79-80.]

### E. BOP Guidelines

Mr. Collier contends that Defendants' treatment failed to comply with various internal guidelines. First, a BOP document entitled "Ophthalmology Guidance" explains that "Medical evaluations [by an eye specialist] are warranted" for certain conditions, including several conditions Mr. Collier complained about during his incarceration. [Filing No. 174-2 at 6-7.] The document further explains:

> This Ophthalmology Guidance is made available to the public for informational purposes only. The Federal Bureau of Prisons (BOP) does not warrant these guidelines for any other purpose, and assumes no responsibility for any injury or damage resulting from the reliance thereof. Proper medical practice necessitates that all cases are evaluated on an individual basis and that treatment decisions are patient specific.

[Filing No. 174-2 at 1.]

Another document, entitled "Volume I – Technical Proposal, Comprehensive Medical Services, FCC Terre Haute" and authored by government contractor and former defendant NaphCare, states that "[w]henever possible, appointments for specialty care will be available within fourteen (14) calendar days from the date of referral to the specialty provider." [Filing No. 174-3 at 8.]

14

### F. Expert Testimony

Defendants proffer two expert witnesses who opined that Mr. Collier received proper medical care during his incarceration. Dr. William Wilson, a family practice physician employed by the BOP at FCC Terre Haute, reviewed Mr. Collier's medical records and opined that "the eye care managed by the primary care practitioners at FCI Terre Haute was medically appropriate and within the standard of care." [Filing No. 164-1 at 7.]

Dr. Brad Sutton, optometrist and professor at Indiana University School of Optometry, likewise reviewed Mr. Collier's medical records as well as his Amended Complaint. [Filing No. 164-30; Filing No. 164-31.] Dr. Sutton opined that the "eye care provided, and facilitated, by the FCI Terre Haute Health Services staff was medically appropriate and within the standard of care. Indeed, there is nothing in the medical records indicating that anyone on the FCI Terre Haute Health Services staff did, or failed to do, anything that resulted in damage to either of Mr. Collier's eyes." [Filing No. 164-31 at 3.] Dr. Sutton's opinion regarding treatment of Mr. Collier's right eye noted the high intraocular pressure diagnosis." [Filing No. 164-31 at 2.] Dr. Sutton's conclusion rests in part upon the conclusion that "Mr. Collier does not appear to have complained . . . about right eye pain." [Filing No. 164-31 at 2.] Dr. Sutton's opinion regarding treatment of Mr. Collier's left eye rests upon the "proper[], timely, and appropriate[]" treatment of the health services staff. [Filing No. 164-31 at 3.]

### G. Procedural History

Mr. Collier brought suit in this Court on December 2, 2014. [Filing No. 1.] The Court screened and dismissed Mr. Collier's Complaint and granted leave to file an amended complaint, [Filing No. 9], which Mr. Collier filed on April 17, 2015, [Filing No. 15]. On May 1, 2015, the Court screened Mr. Collier's Amended Complaint, permitting his deliberate indifference and

retaliation claims to proceed against the current Defendants and Ms. Kimberly Klink. [Filing No. 16.] On January 20, 2016, the Court granted summary judgment to Ms. Klink. [Filing No. 53.] On February 22, 2016, counsel for Mr. Collier entered his appearance in this matter. [Filing No. 60.]

On July 27, 2016, the Court granted summary judgment to Defendants on Mr. Collier's retaliation claim and denied summary judgment as to Mr. Collier's deliberate indifference claims. [Filing No. 69.] On December 19, 2016, the Court permitted Mr. Collier to join NaphCare as a Defendant, [Filing No. 89; Filing No. 90], which Mr. Collier dismissed by stipulation on June 5, 2017, [Filing No. 136]. Mr. Collier also attempted to amend his complaint to add a claim against the United States under the Federal Tort Claims Act, [Filing No. 85], but that motion was denied for failure to exhaust administrative remedies prior to bringing suit, [Filing No. 97]. Without the proposed tort claims against NaphCare and the United States based upon the medical care provided by their employees, the only remaining claims are Mr. Collier's deliberate indifference claims against the named Defendants based upon each Defendant's individual actions. Defendants now move for summary judgment in their favor. [Filing No. 164.] Mr. Collier responded, [Filing No. 174], and Defendants have replied, [Filing No. 177]. Defendants' Motion is now ripe for determination.

### III.
#### DISCUSSION

Defendants raise three arguments in support of their Motion for Summary Judgment. First, Defendants argue that Warden Caraway, Warden LaRiva, Ms. Desmith, and Ms. Bowman ("Nonmedical Defendants") all lack the personal involvement necessary for Mr. Collier's deliberate indifference claims. [Filing No. 165 at 15-17.] Second, Defendants argue that Mr. Collier lacks evidence showing that any Defendant, including Dr. Bailey and PA Daugherty

("Medical Defendants"), acted with deliberate indifference. [Filing No. 165 at 17-20.] Finally, Defendants argue in the alternative that they are entitled to qualified immunity. [Filing No. 165 at 20-25.]

In response, Mr. Collier first argues that the Nonmedical Defendants were aware of Mr. Collier's condition and treatment requests. [Filing No. 174-1 at 5-7.] Mr. Collier argues that the evidence shows that he frequently complained of his conditions, especially regarding his right eye issues. [Filing No. 174-1 at 5-7.] Second, Mr. Collier argues that the nature of Mr. Collier's keratoconus in his left eye and high intraocular pressure in his right eye, as described on various websites, create a genuine issue of material fact as to whether Defendants acted with deliberate indifference. [Filing No. 174-1 at 7-10.] Mr. Collier argues that the expert opinions are insufficient to warrant judgment as a matter of law, particularly as to Mr. Collier's complaints of right eye pain. [Filing No. 174-1 at 9.] Finally, Mr. Collier argues that Defendants are not entitled to qualified immunity. [Filing No. 174-1 at 10-11.]

In reply, Defendants reiterate each of their arguments. [Filing No. 177.] Defendants first argue that Mr. Collier fails to even mention Dr. Bailey or PA Daugherty in his response brief. [Filing No. 177 at 2-3.] Second, Defendants reiterate their arguments that the Nonmedical Defendants were not personally involved in Mr. Collier's medical treatment. [Filing No. 177 at 4-7.] Third, Defendants argue that Mr. Collier's opinions and internet research are insufficient to create a genuine issue of material fact as to whether Defendants acted with deliberate indifference. [Filing No. 177 at 8-12.] Finally, Defendants close by again asserting entitlement to qualified immunity. [Filing No. 177 at 12-13.]

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII; *Helling v. McKinney*, 509 U.S. 25, 31 (1993). As relevant to Mr. Collier's

claims, the Eighth Amendment imposes a duty on prison officials to provide medical care to inmates. *Vance v. Peters*, 97 F.3d 987, 991 (7th Cir. 1996). Specifically, "[p]rison officials violate the Constitution if they are deliberately indifferent to prisoners' serious medical needs." *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011). "Deliberate indifference may occur where a prison official, having knowledge of a significant risk to inmate health or safety, administers blatantly inappropriate medical treatment, acts in a manner contrary to the recommendation of specialists, or delays a prisoner's treatment for non-medical reasons, thereby exacerbating his pain and suffering." *Perez v. Fenoglio*, 792 F.3d 768, 777 (7th Cir. 2015) (internal quotations omitted).

However, "[d]eliberate indifference is not medical malpractice; the Eighth Amendment does not codify common law torts." *Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008). Rather, "a prisoner is only entitled to reasonable measures to meet a substantial risk of serious harm." *Arnett*, 658 F.3d at 758. In order for an inmate to maintain a claim for medical mistreatment or denial of medical care, the prisoner must demonstrate that prison officials engaged in "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). This requires a "'sufficiently culpable state of mind,' something akin to recklessness." *Arnett*, 658 F.3d at 751 (quoting *Johnson v. Snyder*, 444 F.3d 579, 585 (7th Cir. 2006)).

Defendants do not contend that Mr. Collier's medical needs were not serious. Rather, they contend that Mr. Collier has not provided evidence to demonstrate that they acted with deliberate indifference. The Court begins by applying this framework to Mr. Collier's claims against each Defendant. Finally, the Court addresses specific principles that apply to each of Mr. Collier's theories of deliberate indifference.

**A. Nonmedical Defendants**

Defendants first argue that Mr. Collier's claims against the Nonmedical Defendants must fail because, as nonmedical personnel, they were not involved in Mr. Collier's care.

In response, Mr. Collier argues that the Nonmedical Defendants were aware of Mr. Collier's complaints, yet still he failed to receive timely treatment. [Filing No. 174-1 at 5-7.]

In reply, Defendants argue that Mr. Collier fails to put forth any evidence demonstrating that the Nonmedical Defendants were personally involved in Mr. Collier's care or did anything wrong in the way they handled Mr. Collier's complaints. [Filing No. 177 at 4-7.]

Mere knowledge of a serious medical condition is insufficient to succeed on a claim for deliberate indifference: "a defendant cannot be liable under *Bivens* on the basis of respondeat superior or supervisory liability, rather, there must be individual participation and involvement by the defendant." *Arnett*, 658 F.3d at 757. "Liability depends on each defendant's knowledge and actions, not on the knowledge or actions of persons they supervise." *Burks v. Raemisch*, 555 F.3d 592, 594 (7th Cir. 2009). This means that prison officials are "entitled to relegate to the prison's medical staff the provision of good medical care." *Id.* at 595. Moreover, an official may not be liable for merely "brush[ing] off [a prisoner's] complaints, leaving them to be handled through the chain of command," *Estate of Miller by Chassie v. Marberry*, 847 F.3d 425, 428 (7th Cir. 2017), or instructing a complaining prisoner to speak to someone else about their issues, *see Arnett*, 658 F.3d at 755. A lay prison official does not have a responsibility "to tell the medical staff how to do its job," *Burks*, 555 F.3d at 596, and "mere negligence in failing to detect and prevent subordinates' misconduct is not sufficient," *Arnett*, 658 F.3d at 755.

Only where a prison official is aware of an "excessive risk to inmate health or safety" and then "simply ignore[s] an inmate's plight"—such as by "condon[ing] or approv[ing]" the

insufficient care, "imped[ing the treaters'] ability to provide effective treatment," or turning a blind eye to unconstitutional treatment—may a prison official face liability under the Eighth Amendment for deliberate indifference. *Arnett*, 658 F.3d at 755-56. In *Arnett*, for example, a case manager was not personally liable for a prisoner's failure to receive medical care where the prisoner went to the case manager "two to three times a week and requested that he be placed back" on the medicine. *Id.* at 755. While the prisoner alleged that the case manager merely told the prisoner to "[g]o talk to" the physician assistant, the Seventh Circuit held that the case manager was entitled to direct the prisoner to the ordinary medical channels. *Id.* at 755-56.

Mr. Collier has failed to demonstrate that any of the Nonmedical Defendants were personally involved in Mr. Collier's treatment or that any of the actions they took evinced deliberate indifference, as discussed below.

### 1. Warden Caraway

As described above, Mr. Collier twice spoke to Warden Caraway, a nonmedical administrative official, about his conditions during main line. Warden Caraway was "hands on," informed Mr. Collier that he would look into his complaints, and, on one occasion, "storm[ed]" over to Ms. Kimberly Klink, Assistant Health Services Administrator, to ask about the delay in Mr. Collier's treatment. Mr. Collier points to no evidence demonstrating that Warden Caraway treated Mr. Collier, made treatment decisions about Mr. Collier, or otherwise interjected himself in the treatment decisions made by the medical professionals.

Under these circumstances, Warden Caraway was entitled to delegate decisions regarding Mr. Collier's medical treatment to the medical professionals. In fact, even though merely "brush[ing] off" a prisoner's complaint generally does not suffice to state a claim for deliberate indifference, *Estate of Miller*, 847 F.3d at 428, Warden Caraway did not brush off Mr. Collier's

complaint but instead demanded answers from Ms. Klink about Mr. Collier's problem. Warden Caraway's actions went beyond those of the case administrator in *Arnett*, who simply directed the prisoner back to the medical department. In this case, the evidence shows that Warden Caraway actively attempted to resolve Mr. Collier's problems. Mr. Collier has failed to demonstrate that Warden Caraway was either personally involved in Mr. Collier's treatment decisions or acted with deliberate indifference in the face of Mr. Collier's complaints. Summary judgment is therefore required for Warden Caraway.

### 2. Warden LaRiva

Similar to Warden Caraway, Mr. Collier twice complained to Warden LaRiva in May 2014 about his medical treatment. [Filing No. 164-28 at 65-66; Filing No. 90-1 at 18.] After Mr. Collier was unsatisfied with the first response, Mr. Collier again complained in a written note that he was not receiving adequate treatment. [Filing No. 164-28 at 65-66; Filing No. 90-1 at 18.] Like Warden Caraway, Warden LaRiva directed Ms. Klink to look into Mr. Collier's Complaints. [Filing No. 164-28 at 65-66; Filing No. 90-1 at 18.] Moreover, Mr. Collier states that Warden LaRiva personally began looking into his complaints after he filed a grievance. [Filing No. 164-28 at 70.]

Again Mr. Collier has failed to show that Warden LaRiva was personally involved in his treatment or acted with deliberate indifference. "This is not a case where [Mr. Collier] was being completely ignored by medical staff," *Arnett*, 658 F.3d at 756, so Warden LaRiva was justified in relying upon the medical professionals to do their jobs. Moreover, after Mr. Collier complained a second time, Warden LaRiva directed another employee to look into Mr. Collier's complaints, and Warden LaRiva was entitled to delegate that task to an appropriate employee. Apparently dissatisfied with that response, Mr. Collier filed at least one grievance, following which Warden

LaRiva personally looked into his complaints. Rather than ignore Mr. Collier's complaints, the evidence demonstrates that Warden LaRiva attempted to address them—first by delegation, and then with her own investigation. This falls far short of the showing of recklessness required to maintain a deliberate indifference claim. Warden LaRiva is likewise entitled to summary judgment. *See, e.g.*, *Berry v. Peterman*, 604 F.3d 435, 440-41 (7th Cir. 2010) (affirming summary judgment for jail administrator where prisoner sent three complaints to administrator and administrator responded to second and third complaints by passing concerns to medical staff).

### 3. Ms. Desmith

Mr. Collier complained to Ms. Desmith, a health services assistant, about his right eye pain on one occasion, [Filing No. 164-28 at 30], and on another inquired as to when he would see an eye specialist, [Filing No. 164-28 at 76-77]. Ms. Desmith responded to Mr. Collier's question that he would be seen on December 2, which fell after Mr. Collier's release date. [Filing No. 164-28 at 77.] Ms. Desmith did not make medical decisions or schedule Mr. Collier's eye specialist appointment and does not have medical training. [Filing No. 164-34 at 1-2; Filing No. 164-28 at 77.] In the absence of any evidence showing that Ms. Desmith otherwise participated in or interfered with Mr. Collier's care, Ms. Desmith is entitled to summary judgment, as she neither was personally involved nor acted with deliberate indifference toward Mr. Collier.

### 4. Ms. Bowman

Mr. Collier frequently complained about his eye problems to Ms. Bowman, a health systems specialist, when he saw her at main line or in other settings. [Filing No. 164-28 at 26-27.] Ms. Bowman is responsible for developing certain internal health care protocols and does not make treatment decisions. [Filing No. 164-35 at 2.] Ms. Bowman informed Mr. Collier about several of his eye appointments and appointment cancellations. [Filing No. 164-28 at 48-49; Filing No.

[164-28 at 92-96.] Mr. Collier's claim against Ms. Bowman was based upon his misapprehension that Ms. Bowman was responsible for optometry scheduling, [Filing No. 164-28 at 93-94], though the evidence demonstrates that this was not the case. Ms. Bowman was not personally involved with Mr. Collier's care and did not act with deliberate indifference toward Mr. Collier. Ms. Bowman is also entitled to summary judgment.

### B. Medical Defendants

To start with, Mr. Collier failed to mention either Dr. Bailey or PA Daugherty in his response brief and has failed to develop an argument as to how their medical care constitutes deliberate indifference. Therefore, the Court accepts Defendants' factual allegations regarding the Medical Defendants' actions and assesses, as required by Rule 56, whether Defendants have established that they are "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c)(1).

Defendants argue that Mr. Collier cannot demonstrate that any Defendant acted with deliberate indifference, pointing to the affidavits of the expert witnesses. Defendants also argue that the actions of the Medical Defendants do not reflect deliberate indifference.

In response, Mr. Collier argues that the expert affidavits are insufficient because they mistakenly conclude that Mr. Collier did not complain to medical professionals about his right eye problems, especially his pain. [Filing No. 174-1 at 3-4.] Mr. Collier cites to certain websites that he contends show how serious his eye conditions were.[4] [Filing No. 174-1 at 4-5.] Mr. Collier does not respond to the Medical Defendants' arguments regarding their specific roles in Mr. Collier's treatment.

---

[4] Mr. Collier also suggests that Defendants violated a regulation or policy. But a violation of guideline or policy is not sufficient to demonstrate deliberate indifference because *Bivens* claims "protect[] against constitutional violations, not violations of departmental regulation and practices." *Estate of Simpson v. Gorbett*, 863 F.3d 740, 746 (7th Cir. 2017) (internal quotation and alterations omitted).

As an initial matter, a plaintiff usually must "introduce[] verifying medical evidence that shows his condition worsened because of [a] delay" in medical treatment. *Knight v. Wiseman*, 590 F.3d 458, 466 (7th Cir. 2009); *Johnson v. Loftin*, 464 F. App'x 530, 532 (7th Cir. 2012) (requiring plaintiff to show that delay "departed from accepted professional standards of care").

Mr. Collier states that Defendants provided insufficient care for the keratoconus in his left eye and intraocular pressure in his right eye, but provides no evidence to support this argument.[5] [Filing No. 174-1 at 7-9.] Dr. Wilson and Dr. Sutton each opined that Mr. Collier received appropriate care during his incarceration. [Filing No. 164-1 at 7; Filing No. 164-30 at 2.] Dr. Sutton additionally opined that nothing "any BOP staff member did or failed to do . . . resulted in damage to either of Mr. Collier's eyes." [Filing No. 164-31 at 2.] At this stage, the burden is on Mr. Collier to provide admissible evidence to demonstrate a genuine issue of material fact as to whether these conditions worsened because of the care he received. Mr. Collier has failed to do so. Therefore, all Defendants are entitled to summary judgment on Mr. Collier's claims that they were deliberately indifferent to Mr. Collier's keratoconus and intraocular pressure.[6] Moreover,

---

[5] Mr. Collier's internet research regarding his conditions is inadmissible hearsay; "[t]o be admissible, documents must be authenticated by an affiant through whom the exhibits could be admitted into evidence." *Szymankiewicz v. Doying*, 187 F. App'x. 618, 622 (7th Cir. 2006); *see Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009) ("[A] court may consider only admissible evidence in assessing a motion for summary judgment."); Fed. R. Civ. P. 56 advisory committee's note (2010 Amendment) ("The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated."). Even if it were admissible, the information is insufficient to demonstrate a genuine issue of material fact as to whether Defendants provided constitutionally sufficient care for Mr. Collier's conditions.

[6] Indeed, the only evidence in the record even referencing Mr. Collier's high intraocular pressure comes from Dr. Patel, an outside ophthalmologist, who only "recommend[ed] trying to get the [intraocular pressure] down" and did not prescribe any medication or treatment for the condition. [Filing No. 164-26 at 4.] This likewise undermines any inference that the named Defendants were deliberately indifferent to the condition.

Mr. Collier has failed to connect any of the Defendants to the allegedly insufficient treatment of these conditions.

Mr. Collier's complaints of unnecessary pain, however, do not require the same expert proof. *Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010) ("[A] non-trivial delay in treating serious pain can be actionable even without expert medical testimony showing that the delay aggravated the underlying condition."). Mr. Collier has provided evidence suggesting that he frequently complained of pain in his right eye. As explained above, the Nonmedical Defendants were not personally involved in the treatment decisions and did not act with deliberate indifference to Mr. Collier's complaints given their roles at FCI Terre Haute.

The same is true for the Medical Defendants, neither of whom Mr. Collier mentions by name in his response brief. Mr. Collier saw Dr. Bailey just one time. Dr. Bailey is not an eye doctor and saw Mr. Collier for an appointment unrelated to his eye difficulties. [Filing No. 164-28 at 29-30.] When Mr. Collier complained of eye problems, Dr. Bailey prescribed him more ophthalmic ointment and told Mr. Collier that he would be scheduled to be seen by a specialist. [Filing No. 164-28 at 72-73.] Mr. Collier fails to demonstrate that Dr. Bailey, who was not an eye doctor, acted with deliberate indifference to his complaints of eye pain by prescribing him ophthalmic ointment and suggesting that Mr. Collier would be scheduled to see a specialist. In fact, according to Mr. Collier, he was shortly thereafter scheduled to see the optometrist, [Filing No. 164-28 at 71-73], and Mr. Collier provides no evidence to link Dr. Bailey to the appointment cancellation. Dr. Bailey is therefore entitled to summary judgment.

Finally, Mr. Collier saw PA Daugherty on just one occasion for a follow up from his January 2014 emergency room visit. [Filing No. 164-23 at 1.] Mr. Collier appears to complain that PA Daugherty ignored his right eye pain and took his ill-fitting contact lenses from him,

without which he could not see.  [Filing No. 164-28 at 80-82; Filing No. 164-23 at 1-2.]  But PA Daugherty placed a request for an outside ophthalmologist appointment the same day he saw Mr. Collier, which was approved the next day.  [Filing No. 164-24 at 1.]  Mr. Collier fails to establish that PA Daugherty's decision to refer Mr. Collier for outside medical care constitutes deliberate indifference to his eye pain.  Mr. Collier's outside appointment was delayed twice thereafter, but Mr. Collier provides no evidence to link PA Daugherty to the scheduling of his appointment. Therefore, PA Daugherty is also entitled to summary judgment.[7]

## IV.
### CONCLUSION

Mr. Collier has failed to demonstrate that there is a genuine issue as to whether Defendants acted with deliberate indifference to his medical conditions.  Therefore, the Court **GRANTS** Defendants' Motion for Summary Judgment.  [Filing No. 164.]  Final judgment will issue accordingly.

Date: 12/11/2017

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only to all counsel of record.**

---

[7] Given that all Defendants are entitled to summary judgment on the merits, the Court need not address Defendants' final argument that they are entitled to qualified immunity.

26